### UNITED STATES DISTRICT COURT

### DISTRICT OF MAINE

| | | |
|---|---|---|
| MICHAEL MAHONE, | ) | |
| | ) | |
| Movant, | ) | |
| v. | ) | Criminal  No. 03-93-B-W |
| | ) | Civil No. 07-148-B-W |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

### RECOMMENDED DECISION ON 28 U.S.C. § 2255 MOTION

Michael Mahone was sentenced on March 2005 after his conviction by a federal

jury for attempted bank robbery and interstate transportation of a stolen vehicle.

Mahone's defense strategy was that he did not rob the credit union; he only participated in

the preparations under threats from an individual referred to as "T."

By way of pertinent background, in ruling on Mahone's direct appeal the First

Circuit summarized the facts and procedural background of Mahone's case as follows:

> On November 10, 2003, a man attempted to rob the Gardiner
> Federal Credit Union in Maine. He was armed with a knife and gun and
> dressed in black. He wore gloves and a ski mask, with white makeup
> around the eyes. Black clothing that Mahone admitted wearing was found
> in a garbage bag near the credit union. Mahone's DNA was found on latex
> gloves, a ski mask, and shoes found near the credit union. Mahone's
> fingerprints were found on makeup kits discarded in a nearby dumpster.
> Mahone's car was discovered near the credit union. Three weeks after the
> robbery, Mahone was found in New Hampshire with a stolen Ford
> Explorer in his possession.
>     Prior to Mahone's trial, on June 25, 2004, the district court
> conducted a daylong hearing on Mahone's motion in limine to exclude
> Maine State Police Crime Laboratory forensic scientist Cynthia Homer's
> testimony that footwear impressions taken inside the credit union matched
> the shoe found with Mahone's DNA. The district court denied the motion
> in a comprehensive published order. United States v. Mahone, 328

F.Supp.2d 77 (D.Me.2004). The district court accepted Homer as an expert in footwear impression collection and analysis, found her methodology for analyzing footwear impression evidence reliable, and concluded that her proffered testimony was admissible under Fed.R.Evid. 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Mahone, 328 F.Supp.2d at 89-92.

At trial, Mahone's counsel raised no objections to allowing Homer's expert testimony, "subject to prior rulings by the court." Homer testified to her opinion that the shoe found with Mahone's DNA had made the impressions found on a stairway and a teller counter inside the credit union.

On October 4, 2004, the jury convicted Mahone of attempted bank robbery and interstate transportation of a stolen vehicle, in violation of 18 U.S.C. §§ 2113 and 2312, respectively. On March 24, 2005, the district court sentenced Mahone. Mahone's sentence included imprisonment and restitution of $5,477.75 for the financial loss borne by the stolen vehicle's insurer.

United States v. Mahone, 453 F.3d 68, 70 (1st Cir. 2006). In addition to other concerns, the discussion below addresses the significance of Homer's testimony, the restitution order, and (playing a very minor role) the Ford Explorer.

Mahone has filed a 28 U.S.C. § 2255 motion delineating 'four'[1] ineffective assistance of counsel grounds, keyed to the four different phases of his criminal proceedings: pre-trial, trial, sentencing, and the direct appeal. Mahone was represented by the same attorney at all four stages. The United States has filed a response seeking summary dismissal and Mahone has filed a reply. For the reasons below, I recommend that the court deny Mahone 28 U.S.C. § 2255 relief.

---

[1]  The four is in parenthesis because some of the grounds are multi-layered and I address them as if they are separate grounds.

2

*Discussion*

Mahone's Sixth Amendment ineffective assistance claims are properly forwarded in a 28 U.S.C. § 2255 motion.  See Massaro v. United States, 538 U.S. 500, 509 (2003). "To prove ineffective assistance of counsel, a defendant must show that 'counsel's representation fell below an objective standard of reasonableness,' and that 'the deficient performance prejudiced his defense.'"  Owens v. United States, 483 F.3d 48, 57 (1st Cir. 2007) (quoting Strickland v. Washington, 466 U.S. 668, 687-88 (1984)). "To prove deficient performance, a defendant must establish that counsel was not acting within the broad norms of professional competence." Id. (citing Strickland, 466 U.S. at 687-91). "Furthermore, to prove prejudice, a defendant must establish that but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." Id. at 57-58 (citing Strickland, 466 U.S. at 694).

**A.  Counsel's Pre-trial Performance: Failure to Specifically Object to the Government's Methodology on Hearsay Grounds**

In his first ineffective assistance of counsel ground, Mahone faults his attorney's performance at the pre-trial phase of his prosecution because he did not object at the Daubert[2] hearing or in his post-hearing memorandum to the fact that the Government failed to provide direct proof that the verification phase of the ACE-V methodology took place.  (Sec. 2255 Mem. at 2.)  He asserts that the effects of this inability to confront witnesses against him spread into the prosecution's summation and impacted the jury's deliberation.  (Id. at 3.)  In his reply memorandum Mahone asserts that there was only

---

[2]    Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

one time – and this was during the trial – that his attorney mentioned hearsay and that

objection was immediately overruled.  (Reply Mem. at 2.)

With regards to the issue of the admission of this evidence, the First Circuit

addressed Mahone's more comprehensive challenge to the expert testimony on direct

appeal as follows:

> Before accepting expert testimony, a district court must determine
> that a witness is "qualified as an expert by knowledge, skill, experience,
> training, or education." Fed.R.Evid. 702. Regarding this threshold inquiry,
> Mahone argues that Homer's qualifications are insufficient, simply
> because she is not qualified as a footwear examiner through the
> International Association for Identification (IAI). This argument has no
> merit. The district court did not abuse its discretion.
>     Homer is sufficiently qualified as an expert. She is a trained
> forensic professional with a specialty in impressions. She has a masters
> degree in forensic science. At trial, she stated that she had made more than
> 11,000 footwear comparisons. She had worked as a "latent impressions"
> specialist for more than two years and had twice testified in court as an
> expert in footwear impressions. She had also taken a 40-hour FBI course
> in footwear and tire impression evidence analysis. She is subject to annual
> proficiency testing by an outside agency. Although Homer was an active
> member in the IAI, she lacked the requisite three years' professional
> experience to qualify for voluntary certification through IAI's footwear
> analysis program. It is not required that experts be blue-ribbon
> practitioners with optional certifications. See United States v. Rose, 731
> F.2d 1337, 1346 (8th Cir.1984) (holding, pre- Daubert, that "[a]n expert
> witness need not be an outstanding practitioner in the field nor have
> certificates of training in the particular subject").
>     At the in limine hearing and at trial, Homer thoroughly described
> the "ACE-V" method (analysis, comparison, evaluation, and verification)
> for assessing footwear impressions, and described her use of the method in
> Mahone's case. Mahone argues, however, that the ACE-V method "utterly
> lacks in objective identification standards" because: 1) there is no set
> number of clues which dictate a match between an impression and a
> particular shoe; 2) there is no objective standard for determining whether a
> discrepancy between an impression and a shoe is major or minor; and 3)
> the government provided "absolutely no scientific testing of the premises
> underlying ACE-V." At issue is Fed.R.Evid. 702(2)'s requirement that an
> expert may testify if "the testimony is the product of reliable principles
> and methods." Mahone's arguments lack merit.

4

From the outset, it is difficult to discern any abuse of discretion in the district court's decision, because other federal courts have favorably analyzed the ACE-V method under <u>Daubert</u> for footwear and fingerprint impressions. <u>See</u> <u>United States v. Allen</u>, 207 F.Supp.2d 856 (N.D.Ind.2002) (footwear impressions), <u>aff'd</u>, 390 F.3d 944 (7th Cir.2004); <u>United States v. Mitchell</u>, 365 F.3d 215, 246 (3d Cir.2004) (favorably analyzing ACE-V method under <u>Daubert</u> in latent fingerprint identification case); <u>Commonwealth v. Patterson</u>, 445 Mass. 626, 840 N.E.2d 12, 32-33 (2005) (holding ACE-V method reliable under <u>Daubert</u> for single latent fingerprint impressions).

Even by looking only to the record in the instant case, no abuse of discretion is evident. The district court explicitly considered the four guiding factors laid out as guidance by the Supreme Court in <u>Daubert</u>: 1) whether the underlying method can be or has been tested; 2) whether the method has been subject to peer review and publication; 3) the method's known or potential error rate; and 4) the level of the method's acceptance within the relevant discipline. <u>See</u> <u>Mahone</u>, 328 F.Supp.2d at 88-92. Our review of the record confirms that these factors support admissibility of ACE-V. The method has been tested in published studies and has been the subject of widespread publication, including books devoted to footwear impressions, although it is not clear that there have been rigorous peer-reviewed articles. Homer offered a potential error rate of zero for the method, stating that any error is attributable to examiners. Finally, ACE-V is clearly highly accepted in the forensics field; the same method is used for latent impression analysis of fingerprints.

Even if there were cause for concern with the ACE-V method, <u>Daubert</u> emphasized that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." <u>Daubert</u>, 509 U.S. at 596. Under this analysis, Mahone's argument regarding the lack of a set number of clues required for an ACE-V match must fail. We have rejected a similar argument that a handwriting analysis method impermissibly lacked a standard for the number of similarities required for a match. <u>See</u> <u>United States v. Mooney</u>, 315 F.3d 54, 63 (1st Cir.2002). Here, as in <u>Mooney</u>, such an argument "misunderstands <u>Daubert</u> to demand unassailable expert testimony." <u>See id.</u>

Not only did Mahone exercise his right to cross-examine Homer at trial regarding the alleged shortcomings in ACE-V, he had the benefit of an earlier <u>Daubert</u> hearing to challenge Homer and ACE-V. Mahone failed to offer his own expert or any other independent evidence revealing reliability concerns with ACE-V or Homer's findings. The district court did not abuse its discretion.

Mahone also raises an argument under Fed.R.Evid. 702(3), which requires that an expert witness have "applied the principles and methods

5

reliably to the facts of the case." Specifically, he argues that there are problems with the verification step of the ACE-V method as applied, because: 1) Homer stated that she had no idea whether the verifying examiner was "blinded" (had not reviewed her report before conducting his examination); and because 2) the government failed to produce the verifying examiner at trial (instead, Homer testified regarding this examiner's background and experience).

      The district court did not abuse its discretion. Other federal courts have found ACE-V to be reliable under Daubert, while noting that verification in ACE-V may not be blinded. See United States v. Havvard, 117 F.Supp.2d 848, 853, 855 (S.D.Ind.2000) ("[T]he second expert may know from the outset that another examiner has already made the positive identification.... [L]atent print identification is the very archetype of reliable expert testimony."), aff'd, 260 F.3d 597 (7th Cir.2001); Mitchell, 365 F.3d at 239 (noting that although ACE-V verification may not be blinded, it still constitutes "peer review" that favors admission of the method).

      At most, Mahone's first verification argument goes only to weight, not admissibility, under Daubert and Ruiz-Troche. There is no evidence that ACE-V mandates blinded verification. Under cross- examination by Mahone's trial counsel, Homer acknowledged only "a lot of debate" over whether a verifying examiner should be blinded.

      Mahone's argument regarding the government's failure to produce the verifying expert at trial does not actually contest the application of the ACE-V method; Mahone does not assert that there was no verification of Homer's findings. Instead, Mahone objects to the government's litigation approach of not presenting the verifying expert as a trial witness. If Mahone intended a hearsay challenge, however, he waived it by failing to make any such argument in his opening brief. See Sullivan v. Neiman Marcus Group, Inc., 358 F.3d 110, 114 n. 1 (1st Cir.2004).

Mahone, 453 F.3d at 70 -73 (footnote omitted) (emphasis added).

      This Court carefully examined the admissibility of the Homer expert testimony in ruling on Mahone's motion in limine. See United States v. Mahone, 328 F.Supp.2d 77, 87 -92 (D. Me. 2004). As part of that examination, the Court addressed Mahone's concern that "there was no evidence of the qualifications of the individual who peer reviewed her conclusions and no evidence that the review was 'blind.'" Id. at 92. The Court stressed: "The record reveals that [Homer's] conclusions were reviewed within the department by

another qualified footwear examiner and her verification process was separately confirmed." Id.  This argument, the Court reasoned, went "to the weight and credibility, not to its admissibility." Id. (citing United States v. Shea, 211 F.3d 658, 668 (1st Cir.2000)). "Even assuming arguendo the Defendant pointed out flaws in Ms. Homer's testimony," the Court explained,  "Daubert itself instructs us that 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" Id. (quoting Daubert, 509 U.S. at 596 and citing Shea, 211 F.3d at 668).

The above discussion demonstrates that the issue of the admissibility of the expert testimony was joined, adjudicated at the trial court level, and examined by the First Circuit Panel.[3]  Mahone attempts to nuance his claim now in this 28 U.S.C.§ 2255 proceeding to besmirch counsel's efforts at the pre-trial phase of his prosecution for not pressing a very particular (pro forma) sort of hearsay objection.  However, as the Court is well aware, see United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993), Mahone's defense attorney labored hard in attempting to undercut the prosecution's case apropos the footprint identification and it cannot be doubted that his performance surpasses the Strickland threshold for measuring adequate representation under the Sixth Amendment.

### B.  Counsel's Performance at Trial

### 1.  Failing to renew a motion for mistrial due to discovery violations

---

[3]       In my view, "if the First Circuit has denied … relief on direct appeal because of a lack of merit on a substantive claim," which it did here, "such a determination does sway this court's Strickland performance and prejudice analysis if the movant's claim is that counsel performed deficiently apropos that legal issue." Brooks v. United States, Civ. No. 07-115-P-S, 2007 WL 4180540, *1 (D. Me. 2007) (recommended decision).

In his first sub-part of his ineffective assistance ground relating to counsel's performance at trial, Mahone faults his attorney for not renewing a motion for mistrial premised on a discovery violation.  In his Section 2255 memorandum, Mahone explains that during his trial the prosecution elicited testimony from one of Mahone's roommates, Joshua Lemieux, that the shoes allegedly used in the robbery were Lemieux's, who had discovered them missing after the robbery and after Mahone's disappearance.  (Trial Tr. at 332-33.)  Defense counsel requested a sidebar and explained to the Court that the defense had an investigator's report pertaining to Lemieux and that this report did not contain any identification of the shoes by Lemieux.  (Id. at 334.)  The prosecutor explained that the government first learned of Lemieux's identification of the shoes as his own when he was being prepped for trial and was shown the picture of the shoes.  (Id. at 335.)   The prosecutor related that there was no report generated as a consequence.  (Id.)

Defense counsel argued in return:

> There may not be a requirement that it's provided to us in advance, but it would be one thing if the government were investigating with the witness on the stand.  Certainly that's – that would be the government's prerogative if they want to take that chance.  It's an entirely different issue where the government has sent investigators to interview this – this witness, ask him questions about some very material evidence, and – and simply by not generating a … report, the government can't get around the requirement that it provide to the defense ---

(Id. at 335-36.)  The prosecutor responded that he met with every witness for purposes of trial preparation (as opposed to investigation) and "showed a lot of witnesses a lot of exhibits, many of them that haven't been shown before."  (Id. at 336.)   Defense counsel retorted:  "The government cannot elect which portions of investigations they choose to put in reports and which portions they chose not to.  The purpose of the discovery rules is

to provide notice to the defense." (Id.)  Defense counsel argued that the government was in violation of its discovery obligations and the prosecutor insisted that there had been no discovery violation. (Id. at 337.)

The defense then moved for a mistrial. (Id. at 337-38.)  The Court ruled:

> Well, I'm going to deny the motion for a mistrial at this time. You can reinitiate it if you have a basis for doing so. At this point my understanding is that the witness has testified. To the extent that Jencks material would be required to be produced, it would not be required to be produced until after the witness has completed his testimony. You have a right to cross-examine him. You've heard the information. You can cross-examine him on whatever information you feel you need to elicit at this time. If you want to renew the motion, you're certainly welcome to do so.

(Id. at 338.)  The Court clarified with defense counsel that the defense was not arguing that this nondisclosure pertained to exculpatory information; rather, it was the type of information that might fall under the Jencks Act. (Id. at 339.)  In short, this Court explained that it had no basis on which it could conclude that a verbatim statement had been taken vis-à-vis Lemieux's identification of the shoes and that the prosecutor was not required "to instruct the agent to take down a verbatim statement for purposes of making it producible under the Jencks Act." (Id. at 340-41.)

As Mahone points out in his memorandum, during cross-examination Lemieux testified that he wore the black shoes he bought at Wal-Mart up until Christmas (Id. at 345- 48.) Mahone seems to think that if counsel had further pressed the issue concerning the shoes that the defense might have been able to suppress evidence of other thefts from his roommates, i.e., that Mahone had stolen a safe from his roommate and that he had taken a gun from another roommate that was later found in the bank teller's stolen vehicle with Mahone's DNA on it. So it is not so much the evidence of the black shoes alone of

which Mahone complains; he thinks that if counsel had been able to persuade the Court on this score then the defense could have stemmed a whole chain of evidence that tied him to the crime – a reverse domino effect.

There is no need to belabor the treatment of this ground.  Mahone is grasping at a will-o'-the-wisp here if he thinks that counsel's efforts concerning the Lemieux testimony apropos the shoes was constitutionally deficient.  The Lemieux shoe evidence was one branch in a forest of evidence and, contrary to Mahone's conceptualization of the evidentiary chain, there was no basis apparent in this record for counsel to renew his motion with the Court at the trial stage.

### 2.  Failing to object to the admission of a letter from Mahone to Zuzana Prcikova

In his second attack on counsel's performance at trial, Mahone faults counsel for not objecting, pursuant to Federal Rule of Criminal Procedure 404(b), to the admission of a letter from him to Zuzana Prcikova which led to inferences that Mahone had a criminal disposition and that he acted in conformity to this disposition.  (Sec. 2255 Mem. at 6.) He also suggests that the prosecution failed to fulfill its discovery agreement with defendant and that, as a consequence, Mahone was unfairly prejudiced by the admission of this evidence he believes was meant to be evidence of other crimes, wrongs, or acts. He faults counsel for not compelling the government "to articulate with suitable precision the 'special' ground for its admission," an objection that he thinks would have allowed the court to weigh the probative value of the letter against its prejudicial effects.   (Id.)  In his reply memorandum Mahone explains: "[W]hile the contents of the letter pertained to the crime charged, the letter itself was not 'part and parcel of the charged offense,'"

10

explaining that "[p]roof of the charge offenses did not 'necessarily' have to involve evidence of the letter."  (Reply Mem. at 3)

In support of this claim Mahone refers to a partial transcript of Prcikova's testimony during cross-examination concerning the admitted letter; he has not provided the court with the actual letter.  The transcript of the pertinent testimony demonstrates that after the government successfully moved for the admission of the letter (Trial Tr. at 609-10), defense counsel attempted to elicit testimony from Prcikova that the letter did not actually counsel her to testify untruthfully (id. at 618-22).  At a court-requested sidebar, counsel explained his strategy apropos the letter:

> Well, my question will be whether there's anything in that document, at any place in that document where Mr. Mahone has asked her to testify as to anything that is not true. This is a document where Mr. Mahone essentially has outlined questions and answers regarding his -- his actions during the robbery and their relationship, and the government's implication is that Mr. Mahone, by this document, is suborning perjury, and certainly the argument would also go towards his guilt.
>
> The fact is that what this is is a document which simply outlines the evidence as she knows it. I believe it's important for the jury to understand the difference between a document which structures the truth into questions and answers and a document in which Mr. Mahone is telling her to testify to something which isn't true.

(Id. at 618-19.)  Because of the witness's difficulty with reading the letter (English being her second language), the defense was not able to make much headway on this score because of the danger of frustrating the jury.  On redirect, however, the prosecutor had Prcikova admit that she thought that the letter from Mahone was telling her what questions would be asked and what she should say, some of which was not the truth.  (Id. at 622-23.)

This is another challenge by Mahone to his attorney's advocacy that falls entirely flat when placed in the context of the record and reviewed under the <u>Strickland</u> standard. It may be true that the letter was not a "necessary" piece of evidence in the Government's case; it was, however, probative evidence as it did, indeed, pertain to the crimes charged. <u>See</u> <u>United States v. Gobbi</u>, 471 F.3d 302, 311 -313 (1st Cir. 2006).

### 3. Failing to impeach expert witness as to inconsistent statements

In his third challenge to counsel's performance at trial, Mahone complains that his attorney missed an opportunity to weaken Homer's credibility as an expert because his attorney referenced an inconsistent statement made at the <u>Daubert</u> hearing instead of highlighting inconsistencies in her trial testimony. (Sec. 2255 Mem. at 7.) Mahone highlights Homer's trial testimony in which she described the verification process in the Mahone investigation:

> In this particular case, because of the quantity of the footwear impressions, my technical leader worked with me on it, and we both went back and forth. There's a lot of open discussion. We don't work in a vacuum in the laboratory and then show our results to somebody. We – there's a lot of communication back and forth. So in this case, my technical leader knew the results of my footwear impression analysis before he actually sat down and did it.
> What I did was left it on the bench for him and said, could you go and have a look at all that? He went in, looked at everything, then the two of us come together, talk about what we see, we don't see, what we like, what we don't like, and then discuss what our conclusions are.

(Trial Tr. at 747.) In follow-up testimony, Homer indicated that her verifier knew his results once he got her final report, but that "when he actually sat down with the test impression and the impressions for the first time" he didn't know her results. (<u>Id.</u> at 784.)

In his reply memorandum, Mahone explains:

While it is agreed that some of Homer's testimony was beneficial, the most damaging part was her testimony that the shoes (with petitioner's DNA inside), found near the dumpster (where petitioner's fingerprints on the make-up kits were found), positively made the impression inside the bank. Through trial testimony and the time stamped images of the bank camera, they were aware of the following: the robber entered the bank at 4:59 p.m.; Vickie Lemieux, a bank employee, left while the robber was in the bank, who testified seeing petitioner's car (Tr. II 126, 13); Steven Curtis, a courier driver, testified he did not see petitioner's car (Tr. II 384, 23) and the robber exiting the bank, in the order listed. These events support petitioner's testimony. Had Homer appeared less credible on the aspect of shoe print identification verification, it would have affected the jury's ability to make essential credibility determinations.

(Reply Mem. at 4.)

The portions of Homer's testimony highlighted by Mahone are a little confusing as to how independent or blind the verification process was. However, it is quite clear that Homer's qualification to testify as an expert was fully litigated in limine and that the parties and the court knew of the dispute about the validity of the verification going into trial. Furthermore, counsel did carefully cross-examine Homer and did pursue inquiry into her footprint methodology at trial, efforts undercutting any claims by Mahone as to the performance prong of Strickland. Furthermore, as the United States points out, certain portions of Homer's expert testimony benefited Mahone and would have been undercut by any challenge to her credibility; Homer represented to the jury that she was not able to find his fingerprints on certain key evidence, a conclusion that helped the defense's theory that he had only a distant involvement with the crime.

**4. Failing to object to prosecution's improper closing and rebuttal statements**

With respect to his fourth complaint about his attorney's performance at trial, Mahone explains that the prosecution during closing and rebuttal "presented comments that called for the jury to look at certain evidence and/or to draw certain inferences."

13

(Sec. 2255 Mem. at 8.)  The prosecutor, Mahone complains "presented over sixty interrogative expressions; either leaving the questions unanswered to allow the jurors to draw their own opinions, answering the questions through support of admitted evidence and testimony or answering the questions based on personal opinion."  (Id.)  Defense counsel was ineffective, Mahone maintains, because he did not object to "statements know[n] to be false, statements not within the scope of the evidentiary scheme and statements that shifted the burden of proof."  (Id.)

Mahone highlights four offending types of statements in his Section 2255 memorandum.  He complains that the prosecutor made statements of personal opinion when opining that the shoes that made the marks on the teller's counter and on the landing were the shoes worn by the defendant.  (Id. at 9.) He also thinks it was improper for the prosecutor to express his opinion in rebuttal that the shirt that was admitted into evidence was the same shirt that Mahone was wearing inside the credit union – after there was testimony that the shirt belonged to Mahone's roommate.  (Id.)

Mahone also believes that the prosecutor made statements that he knew to be false when he told the jury that after Mahone read the discovery materials and learned the details of the case against him he changed his story and told the jury that it "was all about T." (Id. at 10.)  Mahone believes that dated letters from him to Prcikova were known to the prosecution and explained the events surrounding the robbery, (id.), and, thus, the prosecutor should have appreciated that Mahone's version of events was not new.

Additionally, Mahone believes that the prosecutor made statements outside the scope of evidence when he asked the jury to speculate about the motives of the person who is running from the credit union, running through the woods and getting wet and

14

muddy, attempting to get away and then, in rebuttal, 'answering' the speculative question by stating "someone was running from the bank and somebody was slipping and sliding and falling in the mud, and it's even on the gun." (Id. at 11.)  Mahone believes that these remarks left the impression with the jury that the government had knowledge of evidence that was not presented to the jury and that the prosecutor was really injecting his personal belief.  (Id.; Reply Mem. at 5.)  He also faults the prosecutor for asking the jury why Mahone did not list the license plate number of the Ford Explorer and then answered his own question by indicating that this was because he stole the vehicle; Mahone insists that there was no other evidence that he knew that this vehicle was stolen.  (Sec. 2255 Mem. at 11-12.)

And, in his fourth quarrel with the prosecution's closing, Mahone contends that the prosecutor shifted the burden of proof when in rebuttal he asked the jury if they noticed that the defense did not try and explain away the letter from Mahone to Prcikova where "he has to give instructions on what somebody should say." (Id. at 12.)  The prosecutor then made a second statement: "[A]nd you didn't see or hear any witnesses contradicting her testimony or the evidence." (Id.)  Mahone acknowledges that his attorney did object and move for a mistrial due to the comment but Mahone believes that the objections should have been made contemporaneously which would have allowed the prosecutor to correct the comment and enable the court to "administer immediate antidotes." (Id. at 13.)  In his reply brief Mahone makes clear that he believes his attorney should have insisted on an additional curative instruction but instead his attorney told the court that the defense did not want this instruction after the court denied the motion for mistrial.  (Reply Mem. at 5-6.)

There is no reason to plow new earth here; the United States has clearly
articulated the reasons and fairly cited the First Circuit law that demonstrates that this
four-point attack has no merit:

> First, as a tactical matter, counsel could reasonably decide not to object to
> the summation as it was being given because to do so would irritate the
> jury, which might conclude the objections were intended only to rattle the
> AUSA's concentration and prevent the jury from hearing what he had to
> say. Competent counsel would also know that an appropriate remedy for
> improper summations could be sought by moving for a mistrial when the
> argument ended. As the record shows, that is exactly what counsel did.
> …Contrary to Mahone's theory, telling the jury that the shoes that made
> the impressions on the teller's counter and the landing were the same was
> not a statement of personal belief. Quite the contrary, it was an appropriate
> effort to convince the jury to accept an argument that found support in the
> evidence: that the impressions found at the crime scene were made by
> Mahone's shoes. See United States v. Laboy- Delgado, 84 F.3d 22, 30-31
> (1st Cir. 1996). It was especially reasonable for counsel not to object to
> this aspect of the closing because it had little bearing on the defense,
> which was that Mahone was pressured into planning the crime but
> ultimately took no part in it.
>
> Similarly, there is no merit to Mahone's quarrel with his counsel's
> failure to object when the AUSA said, "[b]ut after reading all the
> government's discovery material and learning the details of the case
> against him, the defendant changed his story and told you that it was all
> because of "T." The evidence supported exactly what the AUSA
> described: that although the Government's evidence implicated Mahone,
> he insisted that the illusive "T" forced him to participate in the planning
> but he withdrew before the crime was executed. See United States v.
> Stroman, 500 F.3d 61, 66 (1st Cir. 2007).

(Mot. Summ. Dismissal at 23-24.)

**5. Failing to object to jury instructions**

The fifth assault on counsel's trial performance is Mahone's contention that his
attorney should have requested a more precise jury instruction on aiding and abetting.
(Sec. 2255 Mem. at 13.)   In his reply memorandum Mahone explains:

> In addition to 'by force, violence…', the grand jury also indicted
> petitioner for 'physical restraint of persons' and 'use of a dangerous

16

weapon'.  Because of the second Superseding Indictment with Sentencing
Allegations, petitioner was entitled to have a jury determination of every
charged element.  Because counsel did not realize the deficiency of the
instructions, the jury was not able to decide upon an element that could
increase the punishment of the verdict.

(Reply Mem. at 6.) And, again, Mahone expresses his belief that the jury should have

been instructed on restraint of the victim, as it was an aggravating factor.  (Sec. 2255

Mem. at 13.)

It is difficult to discern exactly what jury instruction Mahone thinks his counsel

should have proposed.  With respect to the aiding and abetting concern, which is the title

issue of this ground, the superseding indictment invoked 18 U.S.C. § 2 as to both counts.

(Crim. No. 03-93-B-W, Docket No. 75.)  The Court did instruct the jury on aiding and

abetting:

Aid and abet. The indictment has charged Michael Mahone either
with actually committing these crimes or aiding and abetting the
commission of the crimes. To aid and abet means intentionally to help
someone else commit the charged crime.
To establish aiding and abetting, the government must prove
beyond a reasonable doubt, first, that someone else committed the crime,
and, second, that Michael Anthony Mahone consciously shared the other
person's knowledge of the crime, intended to help him or her, and willfully
took part in the endeavor seeking to make it succeed.
Michael Anthony Mahone need not perform the crime, be present
when it is performed, or be aware of the details of its execution to be
guilty of aiding and abetting, but a general suspicion that an unlawful act
may occur or that something criminal is happening is not enough. Mere
presence at the scene of the crime and knowledge that the crime is being
committed are not -- also not sufficient to establish aiding and abetting.
For aiding and abetting an armed credit union robbery, the shared
knowledge requirement extends to both the robbery itself and the
understanding that a weapon would be used. Knowledge includes notice of
the likelihood that the principal would use a dangerous weapon, defined as
a reasonable likelihood, not a high likelihood, low likelihood, or
semilikelihood. An enhanced showing of constructive knowledge will
suffice.

17

(Oct. 4, 2004, Partial Trial Tr. at 70- 71, Crim. No. 03-93-B-W,  Docket No. 136.)

The Court also instructed the jury that if it found Mahone guilty of armed credit union robbery, it should also answer two separate factual questions about how the robbery was carried out:

> One, physical restraint to facilitate the commission of the offense. The first question is whether you find beyond a reasonable doubt that in committing the offense of attempted armed credit union robbery Michael Anthony Mahone physically restrained a person or persons to facilitate commission of the offense and to facilitate escape.
>
> The term physically restrained refers to the forcible restraint of the victim, such as being tied, bound, or locked up.
>
> Two, otherwise used a dangerous weapon. The second question is whether you find beyond a reasonable doubt that in committing the offense of attempted armed credit union robbery, Michael Anthony Mahone otherwise used a dangerous weapon.
>
> The second question uses the terms dangerous weapon and otherwise used. A dangerous weapon, for purposes of this question, is either an instrument capable of inflicting death or serious bodily injury or an object that is not an instrument capable of inflicting death or serious bodily injury but closely resembles such an instrument.
>
> The question asks whether the defendant otherwise used a dangerous weapon. Otherwise used, with reference to a dangerous weapon, including a firearm, means that the conduct did not amount to the discharge of a firearm, but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon.
>
> Brandishing, with reference to a dangerous weapon, including a firearm, means that all or part of the weapon was displayed or the presence of the weapon was otherwise made known to another person in order to intimidate that person, regardless of whether the weapon was directly visible to that person.
>
> Although the dangerous weapon does not have to be directly visible, the weapon must be present. For you to find beyond a reasonable doubt that in committing the offense of attempted armed credit union robbery Michael Anthony Mahone otherwise used a dangerous weapon, you must find that Michael Anthony Mahone's conduct amounted to more than brandishing, displaying, or possessing a firearm or other dangerous weapon.

(Id. at 65-66.)

18

This being a case tried in the interstice between <u>Blakely v. Washington</u>, 542 U.S. 296, 303 (2004), and <u>United States v. Booker</u>, 543 U.S. 220 (2005), the jury did in fact make a determination of these two facts, answering both questions in the affirmative. (Crim. No. 03-93-B-W, Docket No. 106.)   So rather than the instruction not being precise enough, these instructions were more precise than now required under <u>Booker</u>. There is no tenable ineffective assistance claim here.

### 6. Failing to object to the rereading of Homer's testimony

Imbedded within the above ground concerning jury instruction is Mahone's complaint that counsel should have responded differently when the jury requested a read-back of certain parts of Homer's testimony.  (Sec. 2255 Mem. at 13 -14.)  Mahone explains that his attorney objected to the jury having only the requested direct-examination read-back – as opposed to both direct and cross-examination – but that his attorney eventually conceded to a partial read-back of the direct examination testimony. (<u>Id.</u> at 13.)   He also believes that counsel should have requested a curative instruction cautioning the jury about placing undue emphasis on read-back testimony.  (<u>Id.</u> at 14; Reply Mem. at 6.)  He insists that even though the court had discretion to comply with the jury's request, counsel's objection simply was not firm enough.  (Reply. Mem. at 6.) He opines:  "In light that after receiving the read-back, the jury reached a verdict in eight minutes, the prejudice is evident."  (<u>Id.</u>)[4]

---

[4]       Mahone also suggests concerns about the jury's requests concerning evidence relating to Prcikova and his belief that there should have been some limiting instruction (Sec. 2255 Mem. at 14), but I am unable to make an intelligible argument out of this portion of Mahone's jury instruction ineffective assistance ground.   Mahone does not revisit this issue in his reply memorandum.

Through the lens of <u>Strickland</u>, it is hard to fault counsel's performance with regards to this request from the jury.  As Mahone concedes, his attorney <u>did</u> object to a partial read-back of the instructions and the court did not sustain this objection.  The jury was asked what portions of the testimony it wanted to hear and the resulting response was honored by the Court.  This Court is of course able to weigh whether or not a "firmer" objection would have made any difference in its handling of the jury's read-back request. <u>See</u> <u>McGill</u>, 11 F.3d at 225.

### 7.  Failing to object to the jury verdict form

Mahone's final qualm with counsel's performance during trial is that his attorney did not insist that the jury verdict form require the jury to decide between whether or not Mahone was a principal <u>or</u> an aider and abettor.  (Sec. 2255 Mem. at 15.)  He explains that the government's theory of the case was that Mahone committed the criminal acts alone, but because the 18 U.S.C. § 2 aiding and abetting provision is applicable to the entire federal criminal code, the jury did not have an alternative charge and "it stands that petitioner was convicted of both."  (<u>Id.</u>)  He "contends that if a court cannot constitutionally obtain convictions for the same act at two different trials, it cannot do so at the same trial. (<u>Id.</u>)  (<u>See</u> <u>also</u> Reply Mem. at 7.)

Had counsel raised this claim it would have been  patently frivolous under the governing law.  <u>See</u> <u>United States v. Andrade</u>, 135 F.3d 104, 110 1st Cir. 1998) ("Section 2(b) is not a separate offense but a general principle of liability that applies without any need for reference in the indictment," citing <u>United States v. Sabatino</u>, 943 F.2d 94, 99-100 (1st Cir.1991)); <u>accord</u> <u>United States v. Mucciante</u>, 21 F.3d 1228, 1234 (2d Cir. 1994) ("The federal aiding and abetting statute, 18 U.S.C. § 2, does not penalize conduct

apart from the substantive crime with which it is coupled, citing <u>United States v. Kegler</u>, 724 F.2d 190, 200 (D.C. Cir.1984)).

### C. Counsel's Representation at Sentencing

With regards to counsel's performance during the sentencing proceedings, Mahone identifies two deficiencies: an improper concession as to the restitution statute applicable to Mahone's case and a failure to object to a non-indicted sentence enhancement.

With regards to the applicable restitution statute, Mahone maintains that counsel should not have conceded that the Mandatory Victims Restitution Act (MVRA) 18 U.S.C. § 3663A(1)(B)(ii) was the appropriate point of reference rather than the Victim and Witness Protection Act (VWPA) 18 U.S.C. § 3663.  (Sec. 2255 Mem. at 16.) The argument that the VWPA/§ 3363, with its consideration of ability to pay, should have applied is premised on the notion that Count 2 did not involve an element of the offense – an act of violence, a plan scheme or conspiracy. (<u>Id.</u> at 16-17.)  The First Circuit panel thoroughly addressed Mahone's challenge to the Court's restitution order when deciding Mahone's direct appeal.  <u>See</u> <u>Mahone</u>, 453 F.3d  at 73 -74 & ns. 3 & 5.  It  is for this Court, as the court which sentenced Mahone, to determine whether or not this 28 U.SC. § 2255 argument would have had any force in altering the total amount of restitution imposed, <u>see</u> <u>McGill</u>, 11 F.3d at 225;  I can decipher no reason on this record that counsel would have had any meaningful success had he articulated this challenge.

Respecting the failure to object to a sentencing enhancement, Mahone faults his counsel for not pressing an <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000)/<u>Booker</u> objection to the court's decision to sentence him based on its conclusion that Mahone was

21

guilty of obstructing justice because of his perjury.  (Sec. 2255 Mem. at 17-19; Reply

Mem. at 7-8.)[5]  On this issue the Court reasoned:

> I also consider the fact, as I've already indicated, that you
> attempted to obstruct justice. You wrote to your girlfriend, Suzanna. You
> gave her a script to testify by. This is what they're going to ask you. This
> is what you should say. And there were variations between that script and
> the truth. And as [the prosecutor] said during the course of this trial, you
> do not need to give written instructions to someone to tell the truth.
>        I also find that you obstructed justice by your own testimony. The
> story about T from JP being the actual perpetrator of this crime, that he
> coerced you somehow into meeting at a bank in Gardiner that you'd never
> been before, and that you dressed yourself up to assist him as an
> accomplice and then later at the last minute turned around and left is
> nothing, Mr. Mahone, but a cock-and-bull story. It is inconceivable in
> view of the mountain of evidence that pointed to you as the sole
> perpetrator. And I have concluded that you are -- you have obstructed
> justice by taking the stand and lying in front of this court. And I find the
> obstruction of justice under Section 3C1.1 as not only mandated, but
> inescapable.

(Mar. 24, 2005, Sentencing Tr. at 109-10, Crim. No. 03-93-B-W, Docket No. 121.)

Mahone was sentenced on March 24, 2005.  Booker was decided January 12, 2005. The

bottom line is that this Court was acting within its Booker sentencing authority when it

made this sentencing determination.

### D.  Appellate Counsel's Failure to Raise the Claims on Direct Appeal

In his final 28 U.S.C. § 2255 ground, Mahone complains: "Not one single of the

aforementioned claim[s] was raised on appeal."  (Sec. 2255 Mem. at 19.)  As he had the

same counsel throughout his criminal proceedings, Mahone believes that his counsel was

ineffective either for not preserving these claims for direct appeal or not raising them on

_____

[5]     The perjury concern was not the only issue that might have warranted an obstruction of justice
enhancement; during sentencing counsel for Mahone argued vigorously to thwart other possible grounds
for the enhancement.

direct appeal.  (Id.)   Mahone acknowledges that "to 'maximize the likelihood of success

on appeal', appellate counsel found the two arguments he as trial counsel[] contested …as

petitioner's representative."  (Reply Mem. at 8.) "The 2255 petition shows,"   Mahone

opines, that "had counsel at least objected and even failed on the issues, there is a

reasonable probability they would prevail, if presented in merits brief on appeal."  (Id.)

Based on my analysis of the claims articulated by Mahone above, I am confident that the

claims in this 28 U.S.C. § 2255 motion were not claims that had any tenability on direct

appeal.  Quite simply, counsel did not perform below the Strickland standard in not

raising these claims in Mahone's direct appeal, particularly as it is evident from the First

Circuit's discussion on direct appeal that counsel chose two strong arguments to press on

appeal that were given a good deal of attention by the Panel.

### Conclusion

For the reasons set forth above, I recommend that the Court deny Mahone 28

U.S.C. § 2255 relief.

### *NOTICE*

A party may file objections to those specified portions of a
magistrate judge's report or proposed findings or recommended decisions
entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by
the district court is sought, together with a supporting memorandum,
within ten (10) days of being served with a copy thereof.  A responsive
NOTICE memorandum shall be filed within ten (10) days after the filing
of the objection.
        Failure to file a timely objection shall constitute a waiver of the
right to *de novo* review by the district court and to appeal the district
court's order.

February 20, 2008.                          /s/Margaret J. Kravchuk
                                            U.S. Magistrate Judge
                                    23